**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| IN RE: BIOGEN INC. SECURITIES LITIGATION | ) | No. 1:15-cv-13189-FDS |
| | ) | Hon. F. Dennis Saylor, IV |
| | ) | Jury Trial Demanded |

**AMENDED CLASS ACTION COMPLAINT**


**THORNTON LAW FIRM LLP**
Michael P. Thornton (BBO #497390)
Garrett J. Bradley (BBO #629240)
Andrea M. Landry (BBO #663932)
100 Summer Street, 30th Floor
Boston, Massachusetts 02110
Telephone: (617) 720-1333
Facsimile: (617) 720-2445
Email: mthornton@tenlaw.com
gbradley@tenlaw.com
alandry@tenlaw.com

*Liaison Counsel for the Class*

**LABATON SUCHAROW LLP**
Jonathan Gardner (admitted *pro hac vice*)
Angelina Nguyen (admitted *pro hac vice*)
Guillaume Buell (BBO #676566)
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email: jgardner@labaton.com
anguyen@labaton.com
gbuell@labaton.com

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**
Peretz Bronstein (admitted *pro hac vice*)
Yitzchak Soloveichik (admitted *pro hac vice*)
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
Email: peretz@bgandg.com
soloveichik@bgandg.com

*Attorneys for Lead Plaintiff GBR Group, Ltd. and Co- Lead Counsel for the Class*

## TABLE OF CONTENTS

I. NATURE OF THE ACTION ..... 1

II. JURISDICTION AND VENUE ..... 8

III. PARTIES ..... 9

IV. CONTROL PERSON ALLEGATIONS ..... 10

V. SUBSTANTIVE ALLEGATIONS ..... 12

A. The Company and its Business ..... 12

B. Defendants Announce the First Tecfidera Patient Death from PML But Reaffirm Confidence in Tecfidera ..... 14

C. The PML Incident Materially Impacts Tecfidera Sales ..... 16

D. Defendants Track Tecfidera Sales and Reduce Sales Compensation Goals In Light of Decreased Sales ..... 20

E. Defendants Downplay Any Negative Impact on Tecfidera Performance ..... 22

F. Defendants Partially Disclose the PML Incident's True Impact on Tecfidera Performance ..... 25

G. Defendants Continue to Downplay The True Extent of the Negative Impact on Tecfidera ..... 26

H. The Whole Truth is Revealed – Biogen Cuts Previously Confirmed Guidance in Half ..... 27

I. Post-Class Period Events ..... 28

VI. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ..... 29

A. Class Period Financials and Guidance ..... 29

B. December 2, 2014 Deutsche Bank BioFEST Conference Call ..... 30

C. January 12, 2015 JPMorgan Healthcare Conference ..... 31

D. January 29, 2015 4Q 2014 Biogen Inc. Earnings Call ..... 31

E. February 25, 2015 RBC Healthcare Conference ..... 35

F. March 2, 2015 Cowen Healthcare Conference ..... 37

G. April 24, 2015 1Q 2015 Biogen Inc. Earnings Call and Partial Disclosure of the Truth ........ 37

H. May 6, 2015 Deutsche Bank Health Care Conference ........ 39

I. May 13, 2015 Bank of America Merrill Lynch Healthcare Conference Call ........ 39

J. May 19, 2015 UBS Global Health Care Conference ........ 40

K. May 27, 2015 Sanford C. Bernstein Strategic Decisions Conference ........ 41

VII. THE WHOLE TRUTH IS REVEALED ........ 41

VIII. ADDITIONAL SCIENTER ALLEGATIONS ........ 44

A. Tecfidera Was Biogen's Leading Source of Revenue ........ 44

B. The Individual Defendants' Awareness of Tecfidera Sales and Physician Perceptions of Tecfidera Safety ........ 46

C. The Individual Defendants' Compensation ........ 46

D. Share Buyback ........ 47

E. As Head of Commercial Operations, Kingsley Oversaw Biogen's Salesforce ........ 47

IX. CLASS ACTION ALLEGATIONS ........ 47

X. APPLICABILITY OF PRESUMPTION OF RELIANCE UNDER THE AFFILIATED UTE DOCTRINE, AND/OR, IN THE ALTERNATIVE, THE FRAUD ON THE MARKET DOCTRINE ........ 49

XI. NO SAFE HARBOR ........ 52

XII. LOSS CAUSATION/ECONOMIC LOSS ........ 53

COUNT I Violation Of Section 10(b) Of The Exchange Act And Rule 10b-5(b) Promulgated Thereunder Against All Defendants ........ 54

COUNT II Violation Of Section 10(b) Of The Exchange Act And Rule 10b-5(a) and (c) Promulgated Thereunder Against All Defendants ........ 57

COUNT III Violation Of Section 20(a) Of The Exchange Act Against the Individual Defendants ........ 59

JURY TRIAL DEMANDED ........ 60

Lead Plaintiff GBR Group, Ltd. ("Plaintiff" or "GBR Group"), by its undersigned attorneys, hereby brings this Amended Class Action Complaint ("Complaint") against Biogen Inc. ("Biogen" or the "Company"), George A. Scangos ("Scangos"), Paul J. Clancy, ("Clancy"), and Stuart A. Kingsley ("Kingsley") (together, the "Defendants"). The allegations herein are based on Plaintiff's personal knowledge as to its own acts and on information and belief as to all other matters, such information and belief having been informed by the investigation conducted by and under the supervision of its counsel, which included interviews of former employees of Biogen and other persons with knowledge of the matters alleged herein (some of whom have provided information in confidence); these confidential witnesses ("CWs") will be identified herein by number (CW1, CW2, etc.), and review and analysis of publicly available information, including United States Securities and Exchange Commission ("SEC") filings by Biogen, as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, media reports about the Company, and consultations with experts. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. On behalf of itself and the class it seeks to represent, Plaintiff alleges as follows:

## I. <u>NATURE OF THE ACTION</u>

1. This action is brought on behalf a Class consisting of all purchasers of Biogen's publicly traded securities, including common stock and exchange-traded options on such common stock, during the period from December 2, 2014 through July 23, 2015, inclusive (the "Class Period"), and who were damaged thereby. Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer or director of Biogen during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v)

Biogen's employee retirement and benefit plan(s); (vi) and the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person. Plaintiff seeks remedies under the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a et seq. (the "Exchange Act").

2. Biogen is a biopharmaceutical company that develops therapies for neurological, autoimmune and hematologic disorders. In 2006, Biogen acquired Fumapharm AG (a privately held pharmaceutical company formerly headquartered in Switzerland) and the rights to Tecfidera (also known as *dimethyl fumarate*), an oral (versus injectable) drug for the treatment of certain forms of multiple sclerosis ("MS"). Tecfidera, an immunosuppressant, was approved by the Food & Drug Administration ("FDA") in March 2013 and the European Commission ("EC") in February 2014.

3. Tecfidera was the main driver of the Company's revenues during the Class Period, comprising between 32% and 34% of the Company's total revenue in Q4 2014, Q1 2015, and Q2 2015. In Q3 2014, in the period leading up to the Class Period, Tecfidera revenue was approximately $787 million, or more than 31% of total revenue. Biogen emphasized the importance of Tecfidera in its October 22, 2014 Form 10-Q, stating that its "current revenues depend upon continued sales of our principal products" including Tecfidera, and that Biogen "may be substantially dependent on sales from our principal products for many years, including an increasing reliance on sales of Tecfidera as we expand into additional markets."

4. On October 22, 2014, however, Biogen announced that an MS patient who had taken Tecfidera for four and a half years as part of a clinical study died of progressive multifocal leukoencephalopathy ("PML"). PML is an infection caused by a virus that is dangerous for individuals with a weakened immune system. This was the first time that Tecfidera, which works by suppressing the immune system, had been associated with PML.

5. After Defendants announced the PML death on October 22, 2014 and throughout the Class Period, Defendants repeatedly and misleadingly reassured the market that the overall risk profile of Tecfidera was unchanged, that they were seeing doctors continue to prescribe it, that the number of patients as "new starts" on the drug continued to indicate sustained growth momentum, and that Tecfidera would continue to drive strong revenue growth. For example, on October 22, 2014, Defendants assured investors that "there is meaningful, still meaningful growth in Tecfidera in the United States, as we continue to penetrate doc[tor]s and penetrate the marketplace" and that they were "very comfortable with the trajectory of the product right now."

6. In touting Tecfidera's success, Defendants emphasized that "the way to think about Tecfidera growth is what portion of new starts" Tecfidera would capture (*i.e.*, new MS patients starting Tecfidera), patients switching over to Tecfidera from other drugs (referred to as "switches"), and market growth.

7. On November 25, 2014, a month after Defendants announced the PML death, the FDA issued a warning and indicated that Biogen would update the Tecfidera label to include information regarding the PML death. The FDA recommended that physicians monitor patients on Tecfidera and "urge[d] health care professionals and patients to report side effects involving Tecfidera to the FDA MedWatch program."

8. Notwithstanding the label change, Defendants continued to express confidence in Tecfidera and its ability to drive revenue growth. On December 2, 2014, the first day of the Class Period and more than a month after announcing the PML death, Defendants claimed that the market for MS treatments was "moving to [oral medications] and the indicators that we have is [*sic*] that Tecfidera is unquestionably the leading oral [drug]." Defendants further stated that Tecfidera's discontinuation rates (*i.e.*, the rate at which patients were taken off the drug) are

"very consistent" even though the Company hoped to "get better performance in the discontinuation rates over a longer period of time."

9. Similarly, in January 2015, Defendants stated "that Tecfidera will continue to be a *major business driver* as it continues to expand in markets where it's already been introduced, and as we introduce it into additional markets around the world," and provided FY 2015 guidance of 14-16% revenue growth. Defendants further stated that the guidance was based on "Tecfidera … represent[ing] the largest contributor to our overall revenue growth."

10. Defendants assured the market that they were working to educate doctors about the label change, and provided no indication that the PML death was materially impacting Tecfidera revenues beyond a minor effect on growth pace. Defendants stated that "the lack of any meaningful change that we see … in the discon[tinuation] rate [of Tecfidera among patients] is encouraging, because it doesn't suggest that there's a change in the profile that people are anxious to pull patients out, but on the contrary."

11. During a February 25, 2015 analyst discussion, Defendants stated that they were "very comfortable with where Tecfidera is in terms of patient capture." Regarding the impact of the PML incident on physicians' perception of safety, they also stated that Tecfidera "has been quite resilient" in light of hesitancy by physicians to prescribe that would have otherwise been expected. On March 2, 2015, Defendants reiterated that Tecfidera was Biogen's "main driver here continuing to grow, continuing to do well" for the Company's market share in MS treatment."

12. On an April 24, 2015 earnings call, Defendants partially disclosed that the PML death was having an impact on Tecfidera sales, stating that while Tecfidera "continued to add patients," it was "at an overall slower rate." However, Defendants misleadingly downplayed the

impact of the PML incident on Tecfidera performance, stating that "our internal market research suggests that physician intent to prescribe may be improving. We believe these data indicate that we are assisting physicians in putting the updated label into context." Defendants did not update or correct the January guidance range for revenue growth, stating that Tecfidera continued to be "the largest contributor to overall revenue growth," with the long-term outlook for Tecfidera remaining "strong."

13. Defendants further stated that there was only "*little* unfavorable impact on the safety perceptions" from the PML incident, that it had already "stabilized," and that the Company was focused on turning it around. Asked how long the complete turnaround would take, Defendants asserted that they had been educating physicians since November 2014, and that they "fundamentally believe that we … still have upward trajectory on Tecfidera from a share perspective, from a patient perspective, no doubt about it."

14. By May 2015, Defendants portrayed any fallout from the PML death as contained, stating that "physicians have kind of digested the information, taken it on board and their *perspective about the safety profile of the drug has kind of gotten back to where it was before the PML event*." According to Defendants, Biogen "continue[d] to see [its] share of capturing of new scripts and switched scripts higher than [its] share. That's usually an indication that we'll get upward momentum in the business."

15. Throughout the Class Period, Defendants also reassured investors that the safety profile of Tecfidera remained unchanged, pointing to its "strong efficacy, convenience and safety profile." On April 24, 2015, Defendants asserted there was "no real change in the benefit-risk profile of the drug for patients with MS," and on May 13, 2015 Defendants stated that the PML

death did not "change the benefit risk profile for [Tecfidera] in any way." Defendants similarly emphasized "the great safety profile of Tecfidera" in conversations with physicians.

16. Bolstering their reassurances regarding Tecfidera's safety profile and its purportedly unaffected financial performance in the U.S., Defendants also touted Tecfidera's expanding revenues in Europe, particularly Germany. In January 2015, following the PML incident, Defendants stated that they had nothing meaningful to report regarding Tecfidera's trajectory in Germany. In February 2015, Defendants told investors that in German urban centers, Tecfidera's uptake among patients was even higher than in the United States.

17. In sum, at no time during the Class Period did Defendants provide any indication that the PML death had materially impacted Tecfidera sales, or caused physicians to stop prescribing Tecfidera or switch patients onto other therapies out of safety concerns. Analysts accepted the Company's narrative about Tecfidera throughout the Class Period.

18. Former Biogen employees confirm, however, that Tecfidera sales dropped steeply after the October 2014 announcement of the PML death and that there was a "big slowdown" Company-wide in Tecfidera market expansion by November 2014. At a Town Hall meeting in November 2014, Scangos told employees that "the overall sense of the trajectory was changing." Employees were warned of pending organizational changes in 2015 because of the PML death's expected "impact on performance."

19. Former employees further confirmed that Biogen adjusted the goals for Tecfidera sales personnel downwards in late 2014/early 2015, to make compensation goals easier to attain. Many sales persons still failed to meet the lowered sales goals. According to former employees, Biogen held a sales meeting in Texas in March 2015 where the PML death was described as a "market event" negatively impacting Tecfidera sales.

20. Only two months after reassuring investors that physicians' perception of Tecfidera's safety had "stabilized" back to where it was before the PML death, and three months after failing to correct guidance, Defendants disclosed the truth about the impact of the PML death on Tecfidera's performance. On July 24, 2015, before the market opened, the Company shocked the market by announcing that it was cutting its revenue guidance *in half*, "based largely on revised expectations for the growth of Tecfidera."

21. In particular, the Company disclosed that "[d]uring 2015, Tecfidera's U.S. patient growth versus prior quarters has moderated primarily due to changing physician prescribing patterns and intense competition." On an earnings call later the same day, Scangos stated that the expected "reacceleration of Tecfidera this quarter… did not happen to any appreciable extent," and Kingsley acknowledged that "we saw moderated patient growth for our MS portfolio as a whole this quarter…. *We believe the safety event reported in late 2014* has created greater caution on the part of both physicians and patients about switching to orals." Clancy also admitted that the "substantial decrease from our prior guidance" to "between 6% and 8%" revenue growth was "primarily driven by a change in our estimate for Tecfidera's trajectory. Our balance of year forecast assumes *limited patient growth for Tecfidera* in the United States."

22. On this news, Biogen's common stock plummeted from $385.05 at the close on July 23, 2015 to $300.03 at the close on July 24, 2015, a decline of more than 22% in a single day on unusually heavy trading volume of 16,611,700 shares, compared with an average daily trading volume over the Class Period of approximately 1,807,174 shares.

23. On July 27, 2015, a J.P. Morgan analyst report stated that "management credibility is clearly tarnished, and there's little doubt that the company is now stuck in the penalty box…. The messy 1Q report was supposed to be a one-time anomaly. Instead, 2Q

results and revised guidance seem to indicate the problem is much more systemic. It's no wonder that investor confidence is shaken." Similarly, on July 27, 2015, a Morgan Stanley analyst report stated that "[Biogen management] has a credibility issue with its seeming inability to stem the now sig[nificant] decline in base business performance."

24. Shortly after disclosing the whole truth about Tecfidera, on October 9, 2015 Biogen announced that Defendant Kingsley, who was responsible for Global Commercial Operations, "will leave the company and a search has been initiated for a permanent replacement."

## II. JURISDICTION AND VENUE

25. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC") (17 C.F.R. § 240.10b-5).

26. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

27. Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b) because Biogen is headquartered in this District and during the Class Period each of the Individual Defendants worked for Biogen in this District.

28. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## III. PARTIES

29. On November 18, 2015, the Court appointed GBR Group to serve as Lead Plaintiff in this securities class action pursuant to the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), Pub. L. 104-67, 109 Stat. 737.

30. Lead Plaintiff GBR Group, Ltd. is a limited partnership organized under the laws of the state of Florida and is located in Jacksonville, Florida. As set forth in the certification attached hereto as Exhibit A, it purchased Biogen securities at artificially inflated prices and has been damaged thereby.

31. Additional Plaintiff Robert L. Myer, individually and in his capacity as trustee and attorney in fact for the accounts listed on Schedule A of his previously filed certification dated October 16, 2015 (Dkt. #25-2), purchased Biogen securities at artificially inflated prices and has been damaged thereby.

32. Defendant Biogen Inc. is a global biotechnology company that markets drugs for multiple sclerosis and other autoimmune disorders. Biogen was formed as a California corporation in 1985 as IDEC Pharmaceutical Corporation ("IDEC"), and became a Delaware corporation in 1997. In 2003, IDEC acquired Biogen, Inc. and changed its name to Biogen Idec Inc. In March 2015, the Company changed its name to Biogen, Inc. Biogen is headquartered in Cambridge, Massachusetts and as of December 31, 2014, the Company had approximately 7,550 employees worldwide. Biogen's securities, at all times relevant here, traded on the NASDAQ under the ticker symbol "BIIB."

33. Defendant Scangos is, and was at all relevant times, Biogen's Chief Executive Officer and a member of the Company's Board of Directors. Scangos was a direct and substantial participant in the fraud.

34. Defendant Clancy is, and was at all relevant times, Biogen's Executive Vice President, Finance and Chief Financial Officer. Clancy was a direct and substantial participant in the fraud.

35. Defendant Kingsley was at all relevant times Biogen's Executive Vice President, Global Commercial Operations. Kingsley held this position from November 2011 to October 2015. Kingsley was a direct and substantial participant in the fraud.

36. Defendants Scangos, Clancy, and Kingsley are collectively referred to as the "Individual Defendants." The Individual Defendants, together with Biogen, are collectively referred to as the "Defendants."

## IV. CONTROL PERSON ALLEGATIONS

37. The Individual Defendants, because of their positions of control and authority as senior executive officers (and as Director for Scangos), had access to the adverse, undisclosed information about Biogen's business and the PML incident's negative impact on Tecfidera's performance through their access to internal corporate documents and information, conversations and associations with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof, and reports and other information provided to them in connection therewith.

38. The Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, and were directly involved in the day-to-day operations of the Company at the highest levels. The Individual Defendants participated in drafting, preparing, and/or approving the public statements and communications complained of herein and were aware of, or recklessly disregarded, the material misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Kingsley led the introduction and launch of Tecfidera when the product was

launched and supervised Biogen's sales force. During the Class Period, Tecfidera was the Company's main revenue source; accordingly, Tecfidera's revenue and sales growth were crucial to the Company's success. The Individual Defendants followed, tracked and were aware of Tecfidera's financial performance, or should have followed, tracked and been aware of it, at all relevant times.

39. The Individual Defendants, as senior executive officers of the Company, were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period. The Individual Defendants were provided with copies of the documents and statements alleged herein to be materially false and misleading prior to or shortly after their issuance or had the ability and opportunity to prevent their issuance or cause them to be corrected. Accordingly, the Individual Defendants are responsible for the accuracy of the public reports, releases, and other statements detailed herein and are primarily liable for the misrepresentations and omissions contained therein.

40. As senior officers and controlling persons of a publicly-held company whose securities were, during the relevant time, registered with the SEC pursuant to the Exchange Act, traded on the NASDAQ, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations and business, and to correct any previously issued statements that were or had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information. The Individual Defendants' wrongdoing during the Class Period violated these specific requirements and obligations.

41. Each of the Individual Defendants is liable as a primary participant in a wrongful scheme and course of business that operated as a fraud and deceit on purchasers of Biogen's

securities during the Class Period, which included the dissemination of materially false and misleading statements (both affirmative statements and statements rendered misleading because of material omissions) regarding Tecfidera sales and revenue and their impact on Biogen's total revenues and revenue guidance during the Class Period. The scheme: (i) deceived the investing public regarding Biogen's operations and business, specifically the PML incident's impact on Tecfidera's financial performance, and the true value of Biogen's securities; and (ii) caused Plaintiff and other members of the Class to purchase Biogen's securities at artificially inflated prices, which fell as the truth about Tecfidera ultimately became known.

42. In making the statements complained of herein, the Individual Defendants, who were senior officers and controlling persons of Biogen, were acting on behalf of the Company in the regular course of business. Therefore, each of the statements made by the Individual Defendants is attributable to the Company.

## V. SUBSTANTIVE ALLEGATIONS

### A. The Company and its Business

43. Biogen is a global biopharmaceutical company that develops and markets treatments for certain neurological, autoimmune, and hematological diseases. Tecfidera, one of four principal MS drugs the Company markets, is an oral therapy approved for use in the United States and the European Union to treat certain forms of MS. It was approved by the FDA in March 2013 and the EC in February 2014. Sales in the United States began in mid-2013. In 2015, the wholesale cost of Tecfidera per patient was approximately $70,000. Thus, each lost sale represented a significant impact on Tecfidera revenue. From its launch, Tecfidera was a significant source of revenue for Tecfidera:

| | Tecfidera Revenue | Total Revenue | Tecfidera Revenue as % of Total Revenue |
|---|---|---|---|
| Q2 2013[a] | $192,100,000 | $1,723,473,000 | 11.15% |
| Q3 2013[b] | $286,400,000 | $1,827,780,000 | 15.67% |
| Q4 2013[c] | $398,000,000 | $1,965,850,000 | 20.25% |
| Q1 2014[d] | $505,700,000 | $2,129,751,000 | 23.74% |
| Q2 2014[e] | $700,400,000 | $2,421,452,000 | 28.92% |
| Q3 2014[f] | $787,100,000 | $2,511,446,000 | 31.34% |
| Q4 2014[g] | $916,000,000 | $2,640,675,000 | 34.69% |
| Q1 2015[h] | $824,900,000 | $2,554,963,000 | 32.29% |
| Q2 2015[i] | $883,300,000 | $2,591,642,000 | 34.08% |
| Total | **$5,493,900,000** | **$20,367,032,000** | 26.97% |

[a] Source: SEC Form 10-Q, dated July 25, 2013.
[b] Source: SEC Form 10-Q, dated October 28, 2013.
[c] Source: SEC Form 8-K, dated January 29, 2014.
[d] Source: SEC Form 10-Q, dated April 23, 2014.
[e] Source: SEC Form 10-Q, dated July 23, 2014.
[f] Source: SEC Form 10-Q, dated October 22, 2014.
[g] Source: SEC Form 8-K, dated January 29. 2015.
[h] Source: SEC Form 10-Q, dated April 24, 2015.
[i] Source: SEC Form 10-Q, dated July 24, 2015.

44. Throughout the Class Period, Tecfidera was Biogen's leading revenue source, accounting for more than 30% of total revenue. During 4Q 2014, Tecfidera revenues were $916 million, or about 35% of the Company's $2.6 billion in revenues. For 1Q and 2Q 2015, Tecfidera revenues were $824.9 million and $883.3 million, or approximately 32% and 34% of the Company's total revenue respectively

45. Biogen repeatedly emphasized Tecfidera's importance, stating in the 3Q 2014, 1Q 2015 and 2Q 2015 Form 10-Qs and the February 4, 2015 Form 10-K that "current revenues depend upon continued sales of our principal products," including Tecfidera, and that the Company "may be substantially dependent on sales from our principal products for many years, *including an increasing reliance on sales of Tecfidera as we expand into additional markets.*" When Biogen issued guidance for FY 2015, Defendants stated that the Company's "plan assumes Tecfidera will represent the largest contributor to our overall revenue growth."

46. At a March 2, 2015 conference, Scangos referred to Tecfidera as "certainly our main driver" while discussing the Company's growing market share in MS treatment.

47. Analysts also reiterated the importance of Tecfidera to Biogen. For example, in a January 30, 2015 research note after the Company announced 4Q 2014 earnings, Deutsche Bank noted that "FY14 results were driven by the strength of Tecfidera with 4Q revenues" and that Biogen's "[m]anagement continues to see Tecfidera growing in 2015." A Stock Report from S&P Capital IQ on May 4, 2015 wrote that S&P Capital IQ sees "revenue growth of 14.4% in 2015 … following the 40.0% and 25.7% growth in 2014 and 2013, respectively, driven by … Tecfidera."

**B. Defendants Announce the First Tecfidera Patient Death from PML But Reaffirm Confidence in Tecfidera**

48. On October 22, 2014, Biogen reported its 3Q 2014 earnings of $2.51 billion, including Tecfidera earnings of $787.1 million. Biogen also reported for the first time that an MS patient treated with Tecfidera had died of pneumonia after developing a rare brain infection from PML. The Company stated that it "reported the case to the regulatory authorities and will work with them to confirm that the language on [Tecfidera's] label provides patients and their physicians appropriate information…." Kingsley assured the market, however, that Defendants remained confident in Tecfidera:

> *[W]e are very comfortable with the trajectory of the product right now*. We're very comfortable as we talked about the portion of new starts and switches we are getting.
>
> Nothing significantly off plan from our standpoint. I think we feel pretty good about the performance.

49. Clancy stated that "there is meaningful, still meaningful growth in Tecfidera in the United States, as we continue to penetrate doc[tor]s and penetrate the marketplace." Asked if Defendants thought doctors would "reconsider use" of Tecfidera in MS patients who could be at

risk for developing PML, Scangos responded only that they were "not in a position to make medical recommendations." Defendants did not indicate that they expected any negative reaction from physicians.

50. Analysts accepted Defendants' statements that the PML death would not have a material impact on Tecfidera. An October 22, 2014 Cowen and Company report stated:

> Management disclosed for the first time a case of PML in a patient on Tecfidera who had a 3-year history of severe lymphopenia…. [T]he first report of PML in over 100,000 patients treated should not be concerning for the other 95% of the MS population.

51. Similarly, an October 22, 2014 Guggenheim Securities, LLC report stated:

> Although additional PML cases would be a concern, we expect minimal impact from the single case on Tecfidera growth, given the event's rarity (1/~100K)…. PML death should have little/no impact on Tecfidera adoption…. Importantly, however, we believe Tecfidera's PML risk will be perceived as low, given a single case in >100K patients dosed.

52. An October 22, 2014 report issued by RBC Capital Markets similarly stated:

> [W]e think Tecfidera remains on a healthy trajectory in big picture [*sic*] and unlikely to be materially negatively impacted…. PML impact likely minimal….

53. On October 22, 2014, a Wells Fargo Securities, LLC analyst stated:

> BOTTOM LINE: We see minimal commercial impact and believe shares are overreacting to the PML report.

54. On November 25, 2014, the FDA issued a warning to the public regarding the patient who died from PML while using Tecfidera. The FDA stated that the patient was not taking any other drugs associated with PML, and advised physicians and patients to monitor for side effects. The FDA further noted that "[a]s a result, information describing this case of PML … is being added to the Tecfidera label."

55. On December 2, 2014, the first day of the Class Period and more than a month after announcing the PML death, Defendants claimed that the market for MS treatments was

"moving to [oral medications] and the indicators we have is [*sic*] that Tecfidera is unquestionably the leading oral [drug]." Defendants further stated that Tecfidera's discontinuation rates (*i.e.*, the rate at which patients were taken off the drug) were "very consistent" even though the Company hoped to "get better performance in the discontinuation rates over a longer period of time."

**C. The PML Incident Materially Impacts Tecfidera Sales**

56. CW1 was a Biogen Area Business Manager ("ABM")[1] from November 2010 to June 2015, and was responsible for parts of southern Florida and Puerto Rico.[2] CW1 reported to Regional Director Robert Nelson, who reported to Senior sales Director Keith Ferguson, who reported to Vice President Todd Nichols, who reported to Vice President of U.S. Commercial Joe Ciaffoni, who reported to Scangos. According to CW1, Tecfidera sales in his region dropped steeply and immediately after the public announcement of the PML death, and there was a large drop in new prescription sales of Tecfidera beginning around November 2014 by almost all of the neurologist customers in his sales territory. CW1 stated that on a regional conference call chaired by Regional Director Nelson ("Nelson") in late 2014 following the PML incident, Nelson told ABMs that their region was not the only region where Tecfidera sales were poor; according to Nelson sales were down in almost every region across the United States.

57. CW2 was a Market Research Manager for Biogen from 2005 to December 2014, reporting to Antonio Melo, the Senior Manager of Business Planning. CW2 attended a Company Town Hall meeting in November 2014 that Scangos led. According to CW2, Scangos's

---

1 According to Biogen, an ABM is a "specialty sales representative position [that is] called upon to sell our Neurology products with key stakeholders in the Multiple Sclerosis community: including Neurologists, allied health professionals, and local MS chapters."

2 All CWs will be described in the masculine to protect their identities. *See* Exhibit B for a list of all CWs cited herein.

presentation (which included a visual component that reflected his talking points) stated that "the overall sense of the trajectory [at Biogen] was changing" following the Tecfidera PML death. The Town Hall meeting also included a presentation on potential organizational changes as a result of the PML death. It was CW2's understanding that the organizational changes stemmed from executive management's expectation that the PML death would have "an impact on performance."

58. CW3 was a Biogen ABM responsible for certain parts of southern Florida and Puerto Rico from May 2012 to June 2015, reporting to Robert Nelson and then Manuel Dueno, who reported to Senior Sales Director Keith Ferguson, who reported to Todd Nichols, who reported to Senior Vice President of U.S. Commercial, Joe Ciaffoni. CW3's responsibilities included selling Tecfidera to neurologists. CW3 stated that his Tecfidera sales were strong until late 2014/early 2015, when sales dropped dramatically and failed to recover by the time he left Biogen in June 2015. CW3 confirmed that there was a large drop in new prescription sales of Tecfidera beginning around November 2014 by almost all of the neurologist customers in his territory. Based on conversations with his neurologist customers, CW3 attributed the decline in sales to the PML death and the subsequent FDA label change in November 2014. According to CW3, ABMs in other Biogen regions reported that their Tecfidera sales also had decreased dramatically by at least January 2015.

59. CW3 attended a national sales meeting in Texas around March 2015, where the PML incident was described as a "market event" and that Tecfidera sales were not on track. According to CW3, speakers at the meeting stated that sales would need to pick up again if the Company was going to meet expected 14-16% revenue growth.

60. CW1 also recalled a national sales meeting in Texas in March 2015. According to CW1, senior Biogen leaders at the meeting acknowledged that the PML death definitely was impacting Tecfidera sales. CW1 stated that at a Tecfidera "town hall" meeting led by Ciaffoni, Ferguson, and Nichols, metrics and graphs were presented that showed a sharp decline in Tecfidera sales in most regions. According to CW1, one presenter stated that "we understand that the market event [*i.e.*, the PML incident] has had an impact on [Tecfidera] sales."

61. CW4 was a Biogen ABM from March 2006 to June 2015 and was responsible for parts of Kansas and northern Oklahoma. CW4's duties included selling MS products, including Tecfidera, to neurologists. CW4 reported to Regional Director for the Midwest region Renee Mercer, who reported to National Sales Director Bill West. CW4 stated that his Tecfidera sales dropped appreciably very early in 2015, while sales of other MS drugs continued to do very well. According to CW4, new prescription rates dropped, and physicians were transferring patients off Tecfidera and onto different therapies. CW4 received quarterly sales goals from Biogen's corporate office and stated that he did not meet his Tecfidera sales goals in 2015. In 2015, CW4 participated in biweekly conference calls with other regional ABMs and Renee Mercer, where Midwest region ABMs reported that they were not meeting their Tecfidera sales goals, up until the time of CW4's departure in June 2015.

62. CW5 was a Biogen ABM responsible for neurology sales, including MS drugs, in areas of North Carolina and Virginia (in the South Region) from April 2013 to April 2015. CW5 reported to Jason Romano, the Associate Director of Divisional Operations Patient Services, who reported to Keith Ferguson, the Senior Sales Directors, who reported to Todd Nichols. CW5 stated that Tecfidera was his "lead product" by early 2014, but recalled a "big slowdown" in Tecfidera market expansion beginning in late October/November 2014 that he discussed with

other Biogen neurology ABMs. According to CW5, there was a linkage between the PML death and the drop in Tecfidera sales.

63. CW5 stated that other ABMs in the South Region discussed on conference calls how poorly their Tecfidera sales were doing throughout the first quarter of 2015. CW5 also began to experience a serious downturn in "start forms" for Tecfidera at the end of 1Q 2015, from 10 to 14 per week to 3 per week around March 2015.

64. CW6 was a Biogen ABM in the Company's Western Region, responsible for sales in Montana, Idaho and Wyoming from 2011 through August 2015. CW6 reported to Regional Sales Manager Chris Stoll, who reported to Senior Sales Director Bill Ames. CW6 stated that prior to the October 2014 announcement of the PML death, Tecfidera had a "hockey stick" (*i.e.*, exponential) growth. Following the October 2014 announcement, CW6 stated that his Tecfidera new starts declined by the end of 2014, and that after October 2014, new prescriptions significantly slowed down. According to CW6, there was a "significant slowdown of people being put on" Tecfidera, and people were more cautious following the PML death. CW6 learned during conference calls that the decline or stoppage in new Tecfidera patients following the PML death occurred in other regions following the October 2014 announcement. CW6 stated that Tecfidera sales never rebounded in 2015 before his departure in August 2015, and there was a significant slowdown during that time.

65. CW7 was a Biogen ABM in the Company's Virginia region from April 2011 to June 2015, responsible for sales of Tecfidera to neurologists in parts of Virginia, West Virginia, and Maryland. CW7 reported to Regional Sales Director Jason Lavinder, who reported to Senior Sales Director-East Stephen Hulse. CW7 stated that his Tecfidera sales were consistently good

prior to the announcement of the PML death in October 2014, but that after the PML announcement his territory "took a hit" beginning in December 2014 or January 2015.

66. CW8 was the Senior Director of Commercial Operations for Biogen from August 2014 to November 2015, a position equivalent to Chief of Staff for the Head of Commercial Operations. CW8 initially reported to Todd Nichols and later to Joe Ciaffoni, the Senior Vice President of US Commercial. CW8's responsibilities included oversight of operations related to Biogen's MS and hemophilia drugs, including Tecfidera. During his tenure at Biogen, CW8 handled operational issues related to Tecfidera on a daily basis. CW8 stated that all of 2015 was "difficult" for Tecfidera and that beginning with the "event in October," he could not recall a time when Tecfidera's sales prospects were not a concern.

67. CW9 was a Biogen ABM responsible for parts of Connecticut and New York from July 2009 to March 2015, reporting to Regional Director Karen Grant, who reported to National Sales Director Stephen Hulse, who reported to Vice President Todd Nichols, who reported to Senior Vice President of U.S. Commercial Joe Ciaffoni. CW9's responsibilities included selling Tecfidera to neurology practices and an MS center. CW9 observed that the ABMs in his territory were not compensated for their Tecfidera sales in 1Q 2015, *i.e.*, they did not meet their Tecfidera sales for that quarter.

### D. Defendants Track Tecfidera Sales and <u>Reduce Sales Compensation Goals In Light of Decreased Sales</u>

68. CW10 was an Executive Assistant from July 2012 to October 2015 in Biogen's Program Leadership & Management team, supporting numerous programs including Tecfidera. CW10's responsibilities included supporting the Program Executive and Program Director of Tecfidera; initially Alpna Seth ("Seth"), who then was replaced by Uthra Sundaram

("Sundaram") prior to the October 2014 PML announcement. Sundaram was a "dotted line" report to Scangos.

69. According to CW10, Sundaram met weekly with Kingsley and Scangos, and quarterly with Clancy. CW10 stated that after the PML death, Biogen's sales and commercial teams monitored sales numbers through various reports. According to CW10, Biogen immediately reached out to the top prescribing doctors as well as big pharmaceutical companies such as CVS Caremark and Walgreens after the PML announcement. CW10 stated that Biogen's commercial team performed "deep drill downs" into sales numbers, including reviews of specific territories that were lagging, and that Sundaram went on "ride-alongs" with Biogen's Medical Science Liaisons, where Sundaram would meet with doctors to discuss the PML death.

70. According to CW10, the entire Tecfidera team would meet during weekly program team meetings to discuss Tecfidera sales numbers and how the PML death affected sales. CW10 stated that Sundaram communicated with Scangos and other senior executives following those meetings. CW10 further stated that Sundaram was involved in the Tecfidera label change after the PML death and knew that the label change would immediately lead to lost sales.

71. CW1 had access to his region's sales information, including the number of prescriptions written. According to CW1, Regional Director Nelson would access other regions' sales metrics to compare their region's performance with that of other regions in the United States.

72. CW4 also confirmed that the Company tracked sales metrics and prescriptions. CW4 stated that when a prescription was sold, Biogen's headquarters knew about it.

73. CW7 also stated that corporate headquarters would have had up to date insight into new prescription rates. CW7 stated that forms needed to be filled out for every new Tecfidera prescription and that corporate offices were given copies of these forms. According to CW7, his territory's sales reports were updated nightly and included the ID number assigned to every new patient and the name of the prescribing neurologist. CW7 stated that the number of new prescriptions dropped after the PML announcement.

74. According to CW1, sales goals for Tecfidera were adjusted downward in December 2014 to make it easier for ABMs to make compensation goals. However, CW1 stated that many ABMs in his region still failed to meet the lowered goals.

75. CW5 confirmed that the Company lowered Tecfidera sales goals around the same time. According to CW5, in January 2015, Todd Nichols, Biogen's Vice President sent an email to ABMs that announced compensation thresholds for sales representatives were being lowered because of "lower guidance due to unforeseen market events" that CW5 understood were based on problems with Tecfidera sales.

### E. <u>Defendants Downplay Any Negative Impact on Tecfidera Performance</u>

76. Following the announcement of the PML death and the FDA's advisory, and contrary to the material decrease in sales reported internally by sales personnel across all regions, Defendants publicly dismissed concerns that the PML death would materially impact Tecfidera performance. Defendants reassured investors that Tecfidera would continue to drive double-digit revenues for Biogen in 2015.

77. On January 29, 2015, Biogen announced 4Q 2014 results, reporting Tecfidera revenues of $916 million, or approximately 35% of total revenues. Defendants reiterated that Tecfidera performance remained strong and stated that they had not seen any meaningful change in discontinuation rates:

> [W]e believe that [Tecfidera] will continue to grow in the US and will grow substantially in international markets, so that we anticipate that 2015 will be another year of meaningful growth for Tecfidera and for our portfolio of MS products, in general.
>
> ***
>
> Tecfidera continued to demonstrate its strong performance, which we believe is a testament to its attractive product profile, combining strong efficacy, favorable safety and tolerability, and the convenience of oral administration.
>
> ***
>
> Importantly, *we have not noticed a meaningful change in Tecfidera discontinuation rates*. We are actively engaging physicians to ensure proper education on the label update. And we believe in the continued growth potential of the product in the US.

Defendants issued FY 2015 guidance of "revenue growth between *14% and 16%*" over 2014, with "Tecfidera [as] the largest contributor to our overall revenue growth."[3] When asked what Defendants were seeing "in terms of physician reactions to the PML case that might be slowing intake," Kingsley reiterated that there was no "meaningful change" because physicians were not pulling patients off Tecfidera, and that Defendants "have the right education [for physicians] in place."

78. Analysts accepted Defendants' assurances. For example, Cowen and Company wrote on January 30, 2015 that "2015 Guidance Should Also Allay Fears, Especially Given B[iogen]'s Track Record Of Conservatism," after noting that Biogen acknowledged but downplayed a deceleration in prescription trends. Deutsche Bank also wrote on January 30, 2015 that "FY14 results were driven by the strength of Tecfidera with 4Q revenues…. Management continues to see Tecfidera growing in 2015. Guidance was in line; however given

[3] Biogen's stock rose $2.07 (an increase of 0.59%) on January 29, 2015 and rose $35.91 (an increase of 10.17%) on January 30, 2015.

B[iogen]'s history with beating expectations, we expect the guidance sets them up well to perform in 2015."

79. Biogen's stock jumped $35.91 on January 30, 2015, an increase of more than 10%.

80. During a February 25, 2015 conference, Kingsley stated that "Tecfidera is a terrific product that is going to perform very well in the market. It is – from the time it launched, it has really driven a lot of conversion in the market or acceleration in the conversion of the market to orals. It's got a good profile…. We've talked in the past we are getting about a third of new starts, which is a very good thing and we're getting a nice portion of the switch pool as well."

81. Kingsley also downplayed the impact of the PML incident, stating that there was no hesitancy by physicians to prescribe Tecfidera, calling the drug "resilient" and reaffirming Tecfidera as a "meaningful growth driver":

> *You would expect to see some hesitancy among some set of physicians* before you get them to have a conversation about that, but *the product has been quite resilient*…in light of that. In 2015, we think *it is still a meaningful growth driver*. US will still see growth and we have geographic expansion as we are rolling out to more markets outside the US.

82. When asked "do you think a lot of the PML noise or news has gotten out there and have you started to see a reacceleration of things when you go out into the – what's the feedback from the salesforce?"; Kingsley responded that Tecfidera was still "capturing a third of new starts that makes a pretty strong statement about what the market's perception of the product is, including safety," emphasizing that there was "no evidence" of "any change in the discontinuation rate."

83. Kingsley also emphasized the continued success of Tecfidera in Germany, noting it's "uptake in [urban] Germany is better than in the US."

84. Similarly, at a March 2, 2015 Cowen Healthcare Conference, Scangos assured investors that "*Tecfidera [is] certainly our main driver here*[,] continuing to grow, continuing to do well."[4]

**F. Defendants Partially Disclose the PML Incident's <u>True Impact on Tecfidera Performance</u>**

85. On the morning of April 24, 2015, Biogen announced 1Q 2015 results. Tecfidera revenues were $825 million, below the market's consensus estimates. For the first time, Defendants partially acknowledged that the PML death was impacting Tecfidera sales in the United States and Germany. Scangos noted that "Tecfidera had a more challenging quarter, due to a number of issues, including an overall slowing of the MS market, the recent launch of Plegridy, *the single PML case reported last year*, and some first-quarter financial dynamics…." In response to this partial disclosure of the PML incident's impact on Tecfidera revenue, Biogen's stock dropped $28.57, or 6.64% of its value, on April 24, 2015.

86. Yet Defendants continued to mislead investors regarding the true extent of the negative impact from the PML death on Tecfidera performance. Scangos reaffirmed that "our long-term outlook for Tecfidera, and for our entire MS portfolio, remains strong." Clancy notably did not update or correct the Company's January guidance of 14-16% revenue growth.

87. According to Kingsley, the Company had successfully educated physicians about the PML death and that prescribing patterns were returning to normal. While physicians saw "some hesitance" among patients, Kingsley stated that "our internal market research suggests that physician intent to prescribe may be improving. We believe these data indicate that we are assisting physicians in putting the updated label into context."

---

[4] Biogen's stock rose $6.20, or 1.51%, on March 2, 2015.

88. Analysts acknowledged the apparent impact of the PML death on Tecfidera, but accepted Defendants' outlook. A Deutsche Bank report on April 24, 2015 titled "Defending [Biogen]. Weakness on 1Q miss is overdone" noted that the stock's "weakness is overdone in the light of MGMT comments. The Management noted that if the US trajectory on Tecfidera does not improve, they may come in at the lower end of the previously provided revenue guidance…."

### G. **Defendants Continue to Downplay The True Extent <u>of the Negative Impact on Tecfidera</u>**

89. At a May 6, 2015 Deutsche Bank conference, when questioned again about the PML incident's impact on Tecfidera, Clancy stated that *any impact had stabilized*:

> I mean, certainly as you noted that *there was a safety event that we talked about in October on Tecfidera that seems to have had a little unfavorable impact on the safety perceptions* that we saw register in a number of our kind of the way we kind of do attitudinal surveys with physicians, *that has stabilized*.

90. At a May 13, 2015 Bank of America healthcare conference, Doug Williams, Biogen's Executive Vice President of Research & Development, emphasized that physician perceptions of Tecfidera's safety profile were the same as prior to the PML death:

> We've done some survey work recently that would suggest that physicians have kind of digested the information, taken it on board and their perspective about the safety profile of the drug has kind of gotten back to where it was before the PML event. That's sort of the first step in being able to get back on that trajectory of putting new patients on the drug.

91. Similarly, at a May 27, 2015 Sanford Bernstein conference, Clancy reiterated that physician's views of Tecfidera safety had "stabilized":

> Certainly there was a safety event late last year where physician perceptions on the safety profile declined a little bit, still in a very good competitive profile vis-a-vis other therapies in the marketplace. *Those have stabilized, right*.

92. Clancy further emphasized that Defendants "continue to see our share of capturing of new scripts and switched scripts higher than our share. That's usually an indication

that we'll get upward momentum in the business" and that "we'd be surprised if we don't see forward momentum from here."

93. Biogen's stock closed at $402.92 on May 27, 2015, up $10.04 from the previous day, an increase of more than 2%.

### H. The Whole Truth is Revealed – Biogen Cuts Previously Confirmed Guidance in Half

94. On July 24, 2015, before the market opened, Defendants cut *in half* previously confirmed guidance for revenue growth, attributing the change to Tecfidera performance and stating in a Form 8-K that "Biogen's mid-year update to its full year 2015 financial guidance consists of the following components: Revenue growth is expected to be approximately 6% to 8% compared to 2014, a decrease from prior guidance based largely on revised expectations for the growth of Tecfidera."

95. Appearing on CNBC prior to markets opening on July 24, 2015, Jim Cramer stated that Biogen's announcement was "a horrendous guide down" from the previous "guidance for their MS drug Tecfidera" and that Biogen's disclosure was "shattering" and a "gaffe[ ] to the people who have loved this stock."[5]

96. In response to the July 24, 2015 disclosures, Biogen's stock price plummeted *over 20%* in a single day on unusually heavy trading volume, with 16,611,700 shares traded compared with an average daily trading volume over the Class Period of 1,807,174 shares.

97. On July 27, 2015, J.P. Morgan stated that "management credibility is clearly tarnished, and there's little doubt that the company is now stuck in the penalty box…. The messy 1Q report was supposed to be a one-time anomaly. Instead, 2Q results and revised guidance

---

[5] The Mad Dash, *Cramer's Mad Dash: Biogen's biotech blues*, CNBC LLC (July 2, 2015, 9:24 a.m. ET), http://video.cnbc.com/gallery/?video=3000400303

seem to indicate the problem is much more systemic. It's no wonder that investor confidence is shaken." Morgan Stanley echoed J.P. Morgan, stating the same day that "[Biogen management] has a credibility issue with its seeming inability to stem the now sig[nificant] decline in base business performance."

## I. Post-Class Period Events

98. At a September 18, 2015 Bank of America Merrill Lynch health care conference, Kingsley acknowledged that the PML death had a significant impact on the safety profile of the drug: "[i]t was clear to us that we were going to get a – some kind of a downtick in the safety profile that *would have some kind of an impact on physician behavior*, but we couldn't tell." Kingsley also admitted that the FDA label change was a meaningful change statement: "the [Tecfidera] label was so clean [prior to the PML incident], the first PML event was a pretty big change statement for a broad base of physicians who were very comfortable with having essentially no safety issues."

99. On October 9, 2015 Biogen announced that Kingsley "will leave the company and a search has been initiated for a permanent replacement." Kingsley's abrupt departure occurred only two months after the Company's disclosures regarding Tecfidera.

100. RBC Capital Markets reported that "Biogen was down almost 4% today … due to uncertainty of the announced resignation of Tony Kingsley, EVP of Global Commercial Operations. Our conversations with investors indicate concerns behind his departure at the end of the quarter. Investors view that the business might not be improving…."

101. On October 21, 2015, Biogen announced that it would eliminate approximately 11% of its workforce.

# VI. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

## A. Class Period Financials and Guidance

102. Defendants' failure to disclose (1) the steep decline in Tecfidera sales, including the impact of slowing "new starts" and high discontinuation rates, and (2) the true impact of the PML death on physician confidence in Tecfidera, as detailed in ¶¶56-67 and ¶¶69-75, rendered the Company's Class Period guidance false and misleading. Those misleading figures are set forth in the tables below:

| Period | Total Guidance (announced Jan. 29, 2015)[a] | Total Guidance (announced July 24, 2015)[b] |
|---|---|---|
| Full-Year 2015 | 14-16% Growth | 6-8% Growth |
| GAAP diluted EPS | $15.45-$15.85 | $14.25-$14.70 |
| Non-GAAP diluted EPS | $16.60-$17.00 | $15.50-$15.95 |

[a] Source: January 29, 2015 Form 8-K
[b] Source: July 24, 2015 Form 8-K

103. Biogen's February 4, 2015 Form 10-K and April 24, 2015 Form 10-Q included certifications signed by Scangos and Clancy, required under the Sarbanes-Oxley Act of 2002 ("SOX"), representing that the "report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

104. Biogen's February 6, 2014 Form 10-K included management's assessment of internal control over financial reporting:

> Our management assessed the effectiveness of our internal control over financial reporting as of December 31, 2013. In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in its 1992 Internal Control — Integrated Framework.

> Based on our assessment, our management has concluded that, as of December 31, 2013, our internal control over financial reporting is effective based on those criteria.

105. The February 4, 2015 Form 10-K included management's assessment of internal control over financial reporting:

> Our management assessed the effectiveness of our internal control over financial reporting as of December 31, 2014. In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in its 2013 Internal Control — Integrated Framework.
>
> Based on our assessment, our management has concluded that, as of December 31, 2014, our internal control over financial reporting is effective based on those criteria.

**B. <u>December 2, 2014 Deutsche Bank BioFEST Conference Call</u>**

106. Clancy made the following false and misleading statements regarding Tecfidera's market share and discontinuation rates during a Deutsche Bank conference call on the first day of the Class Period, December 2, 2014:

> **Robyn Karnauskas - Deutsche Bank - Analyst**
>
> Tecfidera is capturing around a third of new patients and 40% of the switch market.
>
> Do you think at this point Tecfidera is settling nicely at 35% market share in the overall market? Or where do you see Tecfidera going?
>
> **Paul Clancy - Biogen Idec Inc. - EVP, Finance & CFO**
>
> [W]e still feel the market, broadly speaking, is moving to orals and *the indicators that we have is that Tecfidera is unquestionably the leading oral... we think there's plenty of tailwind still left.*

107. Clancy's statements that "the indicators that we have is that Tecfidera is unquestionably the leading oral" and that Clancy believed there was "plenty of tailwind still left" were false and misleading because he knew there had been a "big slowdown" in Tecfidera

market expansion by November 2014 and that sales were down in almost every region in the United States. *See* ¶¶56-58, 62, 64, 66, 69-73.

**C. <u>January 12, 2015 JPMorgan Healthcare Conference</u>**

108. Scangos made the following false and misleading statements regarding Tecfidera's ability to drive business:

> *2014 was a really good year for Biogen … and we believe that this can be sustained going into the future. Our core business based on our existing suite of products is robust. Products continue to do well.*
>
> ***
>
> *We believe that [Tecfidera]will continue to be a major business driver* as it continues to expand in markets where it's already been introduced, and as we introduce it into additional markets around the world.

109. Scangos's statements that (1) Biogen's performance in 2014 "can be sustained going into the future"; (2) the Company's "core business based on our existing suite of products is robust"; and (3) "Tecfidera will continue to be a major business driver" were false and misleading because of the immediate and significant impact the PML death had on Tecfidera sales in late 2014 and into 2015. *See* ¶¶56-58, 61-62, 64, 66, 69-73.

110. A January 12, 2015 J.P. Morgan report summarized Scangos's positive statements:

> Overall, the tone of CEO George Scangos' presentation – to a packed house – was positive as he reviewed the company's core commercial business (currently capturing ~38% of the MS market)….

**D. <u>January 29, 2015 4Q 2014 Biogen Inc. Earnings Call</u>**

111. On the January 29, 2015 earnings call, Scangos made the following false and misleading statements regarding Tecfidera's growth:

> [W]e believe that *[Tecfidera]will continue to grow in the US* and will grow substantially in international markets, so that *we anticipate that 2015 will be*

> *another year of meaningful growth for [Tecfidera]* and for our portfolio of MS products, in general.

112. Scangos's statements that "Tecfidera will continue to grow in the US and will grow substantially in international markets" such that he expected "2015 will be another year of meaningful growth for Tecfidera" were false and misleading because Tecfidera sales had declined in almost every region by the end of 2014 and into 2015, leading the Company to lower Tecfidera sales goals by January 2015. *See* ¶¶56-58, 61-62, 64, 66, 69-75.

113. On the same call, Kingsley made the following false and misleading statements regarding Tecfidera discontinuation rates following the PML incident:

> *Importantly, we have not noticed a meaningful change in [Tecfidera]discontinuation rates*. We are actively engaging physicians to ensure proper education on the label update. *And we believe in the continued growth potential of the product in the US*.

114. Kingsley's statements that Defendants "have not noticed a meaningful change in Tecfidera discontinuation rates" and that they "believe in the continued growth potential of the product in the U.S." were false and misleading because Kingsley knew sales were down in almost every region in the United States. *See* ¶¶56-58, 61-62, 64, 66, 69-75. Kingsley also admitted after the Class Period that Defendants knew the PML death had led to a significant change to the safety profile and physicians' confidence in Tecfidera. *See* ¶¶98, 150.

115. On the same earnings call, Clancy made the following false and misleading statements regarding Tecfidera performance:

> *We expect revenue growth between 14% and 16%.… Our plan assumes [Tecfidera] will represent the largest contributor to our overall revenue growth.*

116. Clancy's statement that Biogen expected "revenue growth between 14% and 16%" with "Tecfidera … represent[ing] the largest contributor to our overall revenue growth"

were false and misleading because by late 2014, Tecfidera sales had steeply declined in almost every region in the United States. *See* ¶¶56-58, 61-62, 64, 66, 69-75.

117. On the same call, in direct response to analyst questions, Clancy and Kingsley made the following false and misleading statements regarding Tecfidera performance and discontinuation rates:

> **Paul Clancy - Biogen Idec Inc - CFO**
>
> *We think this is still a very meaningful growth with [Tecfidera] that's embedded in the guidance for this year.*
>
> ***
>
> **Brian Abrahams - Wells Fargo Securities, LLC - Analyst**
>
> [I]nterestingly, you're not seeing any increase in discontinuations…. what are you seeing, in terms of physician reactions to the PML case that might be slowing uptake, and what sorts of educational initiatives do you think will be needed to help physicians work around this?
>
> **Tony Kingsley - Biogen Idec Inc - EVP, Global Commercial Operations**
>
> *So we think we have the right education in place. We have to keep executing it, making sure that things continue to happen.*
>
> *[T]he lack of any meaningful change that we see – or we believe we're seeing – in the discon[tinuation] rate is encouraging, because it doesn't suggest there's such a change in the profile that people are anxious to pull patients out, but on the contrary.*

118. Kingsley's statement that the Company was "executing" on its educational initiatives with physicians in light of the PML death, and there was no change in the profile of Tecfidera that was causing physicians to pull patients off the drug were false and misleading because Defendants knew sales were down in almost every region in the United States. *See* ¶¶56-58, 61-62, 64-66, 69-75. Kingsley also admitted after the Class Period that Defendants knew the PML death had led to a significant change to the safety profile and physicians' view of Tecfidera. *See* ¶¶98, 150.

119. Clancy's statement that there was "still a very meaningful growth with Tecfidera that's embedded in the guidance for this year" was false and misleading because he failed to disclose that by late 2014 and into 2015 sales were down in almost every region in the United States. *See* ¶¶56-58, 61-62, 64, 66, 69-75.

120. Biogen's stock price rose $2.07 (0.59%) on January 29, 2015 and $35.91 (10.17%) on January 30, 2015.

121. Analysts reacted positively to the Company's message that Tecfidera sales were on target, with no material impact from the PML death. Deutsche Bank issued a report on January 29, 2015 stating:

> Tecfidera 4Q revenues at $916M were higher than consensus at $879M. This removes a big overhang on the stock as investors were worried about the performance of the base business. In our opinion, in-line revenue guidance with higher-than-consensus EPS guidance sets the company up well for 2015.

122. On January 29, 2015, a J.P. Morgan analyst reported that the Tecfidera "discontinuation rate has been stable."

123. A January 29, 2015 PiperJaffray report stated that "BIIB posted strong 4Q numbers… and provided robust 2015 guidance, confidence in the growth outlook for Tecfidera and its franchise overall."

124. A January 29, 2015 report from William Blair & Co. stated :

> Fourth-quarter operating performance was driven by better-than-expected sales of Tecfidera, which we highlight, given investor concerns following the report of a PML-related death late last year.

125. A January 29, 2015 Barclay's report stated that "[i]mportantly, Biogen indicated no change in the discontinuation rate."

126. A January 30, 2015 Deutsche Bank report observed that "[s]trong Tecfidera sales" drove revenues in closing out 2014, and the 2015 "[n]et revenue growth is again driven by

Tecfidera sales," noting that Biogen's management "commented that Tecfidera will represent a large contributor to overall growth."

127. Guggenheim Securities stated on January 30, 2015 that "BIIB's '15 guidance implies continued strong Tecfidera growth, driving the stock sharply higher…. Tecfidera continues strong**.** We believe Tecfidera is quickly becoming the front-line MS treatment of choice, and we expect upside to '15 sales est[imates]."

### E. <u>February 25, 2015 RBC Healthcare Conference</u>

128. Kingsley made the following false and misleading statements regarding Tecfidera's safety profile and discontinuation rate during the February 25, 2015 RBC Healthcare Conference:

> **Michael Yee - RBC Capital Markets - Analyst**
>
> So maybe talk a little bit about what you are seeing with Tecfidera since 2014 and how we should be thinking about Tecfidera for 2015.
>
> **Tony Kingsley - Biogen Idec Inc. - EVP, Global Commercial Operations**
>
> *[W]e think Tecfidera is a terrific product that is going to perform very well in the market*…. It's got a good profile. We have positioned it as a great first-line therapy and a great switch-to therapy and that's where the source of our business comes. *We've talked in the past we are getting about a third of new starts, which is a very good thing and we're getting a nice portion of the switch pool as well*.
>
> ***
>
> Fourth quarter, we had the report of one PML incident and I think we talked about this at the earnings call and toward the end of the year, which is that is a meaningful event that you have to manage through. There's a lot of communication that has to happen to physicians. *You would expect to see some hesitancy among some set of physicians before you get them to have a conversation about that, but the product has been quite resilient I think is our view in light of that. In 2015, we think it is still a meaningful growth driver*.
>
> ***

**Michael Yee - RBC Capital Markets - Analyst**

So in the fourth quarter, and this is important because we are thinking about Q1, do you think a lot of the PML noise or news has gotten out there and have you started to see a reacceleration of things when you go out into the – what's the feedback from the salesforce?

**Tony Kingsley - Biogen Idec Inc. - EVP, Global Commercial Operations**

*[I] think the most positive message I would say on Tecfidera is if you are still capturing a third of new starts that makes a pretty strong statement about what the market's perception of the product is, including safety. We have not seen any change in the discontinuation rate…You would obviously get very concerned if you saw a spike in the discontinuation rate, no evidence of that.*

**Michael Yee - RBC Capital Markets - Analyst**

Do you think it is stable? Do you think discontinuation has been very stable?

**Tony Kingsley - Biogen Idec Inc. - EVP, Global Commercial Operations**

*It has been consistent with – we look at it relative to the growth of [product goods]. There is nothing to signal this is not consistent with historical averages.*

129. Kingsley's statements that (1) Tecfidera was "going to perform very well in the market"; (2) "capturing a third of new starts that makes a pretty strong statement about what the market's perception of the product is, including safety"; (3) the Company was not seeing hesitancy among physicians in light of Tecfidera being "resilient" and that "it is still a meaningful growth driver; and (4) there was "nothing to signal" that Tecfidera's discontinuation rate was "not consistent with historical averages" were false and misleading because by late 2014 and into 2015, sales had declined in most regions. *See* ¶¶56-58, 61-66, 69-75. Kingsley also admitted after the Class Period that Defendants knew the PML death had led to a significant change to the safety profile and physicians' view of Tecfidera. *See* ¶¶98, 150.

130. In a note published on the evening of February 25, 2015, Michael Yee of RBC Capital Markets stated:

> Regarding potential slowdown in Tecfidera, the company remains comfortable with the meaningful one-third share that the drug continues to capture within the new start pool.... Believe the product has been quite resilient following the one PML case and the discontinuation rates remain consistent.

### F. March 2, 2015 Cowen Healthcare Conference

131. At a March 2, 2015 Cowen Healthcare Conference, Scangos made the following false and misleading statements regarding Tecfidera:

> [W]e believe it is growing and we'll continue to gain market share and that's a result of the four drugs you see here *[Tecfidera] certainly our main driver here continuing to grow, continuing to do well.*

132. Scangos's statement that Tecfidera would continue to be a "main driver" and was "continuing to do well" was false and misleading because he failed to disclose that sales had declined across the United States since late 2014 and into 2015, and that the Company had been forced to lower sales thresholds for sales teams. *See* ¶¶56-58, 61-66, 69-75.

### G. April 24, 2015 1Q 2015 Biogen Inc. Earnings Call and Partial Disclosure of the Truth

133. On the April 24, 2015 earnings call, Defendants partially disclosed the truth regarding the PML incident's negative impact on Tecfidera sales. In addition to reporting Tecfidera revenue of $648 million for 1Q 2015 in the U.S. that was below consensus estimates in the market, Kingsley disclosed an increased hesitancy among patients regarding Tecfidera: "We just spent much of this week in talking to physicians and understanding what their perspective is…. what they are seeing is more hesitancy among patients.... [T]hey see some hesitance in the conversations that they are having with patients."

134. In response to the partial disclosure of the truth regarding patient and physician reaction following the PML death, and lower than expected Tecfidera revenue, Biogen's stock price dropped $28.57 (approximately 6%) on April 24, 2015.

135. However, Defendants continued to mislead the market regarding the true extent of the PML death's impact on Tecfidera sales. Scangos, Clancy and Kingsley made the following false and misleading statements regarding Tecfidera performance while failing to update or correct earlier-issued FY 2015 guidance (and thus confirming it):

> **Tony Kingsley - Biogen Inc. - EVP, Global Commercial Operations**
>
> ….[Tecfidera] continued to add patients this quarter, but at an overall slower rate. *In the US, our internal market research suggests that physician intent to prescribe may be improving*. We believe these data indicate that *we are assisting physicians in putting the updated label into context….. We continue to believe that [Tecfidera] remains the preferred oral option in the market, given its strong efficacy, convenience and safety profile.*
>
> ***
>
> **Paul Clancy - Biogen Inc - CFO**
>
> *[W]e won't be updating our formal guidance this quarter…. we continue to expect [Tecfidera] will represent the largest contributor to our overall revenue growth*. If the US trajectory does not improve, we may come in at the lower end of our previously provided revenue growth.
>
> ***
>
> **George Scangos – Biogen Inc – CEO**
>
> Obviously, a top priority for us is the growth of our entire MS portfolio, including [Tecfidera]. We believe that [Tecfidera] is a compelling treatment option for MS patients, and *our long-term outlook for [Tecfidera], and for our entire MS portfolio, remains strong*.

136. In an effort to blunt the partial corrective information, Kingsley's statement that "physician intent to prescribe may be improving" was false and misleading because Tecfidera sales continued to be significantly lower following the PML death. *See* ¶¶56-67, 69-75. In addition, Kingsley's statement that "our internal market research suggests that physician intent to prescribe may be improving" because Defendants admitted after the Class Period that to the contrary, Biogen's market research indicated a moderation in physician intent to prescribe.

137. Clancy's statement that "we won't be updating our formal guidance this quarter.… we continue to expect [Tecfidera] will represent the largest contributor to our overall revenue growth" was false and misleading because the 14-16% metric was no longer achievable based on Tecfidera sales trends as of March 2015. *See* ¶¶56-67, 69-75.

138. Scangos's statement that "our long-term outlook for Tecfidera … remains strong" was false and misleading because Tecfidera's trajectory had changed immediately following the announcement of the PML death, and sales continued to be down across the United States, forcing the Company to lower compensation thresholds. *See* ¶¶56-67, 69-75.

**H. <u>May 6, 2015 Deutsche Bank Health Care Conference</u>**

139. Clancy made the following false and misleading statements at a May 6, 2015 Deutsche Bank conference:

> **Paul Clancy - Biogen Inc. - CFO**
>
> *But we fundamentally believe that we got, we still have upward trajectory on [Tecfidera] from a share perspective, from a patient perspective*, no doubt about it.

140. Clancy's statement that "we fundamentally believe that we got, we still have upward trajectory on Tecfidera" was false and misleading because he knew that the current trajectory of Tecfidera in the United States had changed immediately after the PML death, and that it still had not recovered at the time of the misleading statement. *See* ¶¶56-67, 69-75.

**I. <u>May 13, 2015 Bank of America Merrill Lynch Healthcare Conference Call</u>**

141. Doug Williams, Biogen's Executive Vice President of Research & Development, made the following false and misleading statements on behalf of the Company regarding Tecfidera's performance:

**Doug Williams - Biogen Inc. - EVP of Research & Development**

> *We've done some survey work recently that would suggest that physicians have kind of digested the information [regarding the PML incident], taken it on board and their perspective about the safety profile of the drug has kind of gotten back to where it was before the PML event.* That's sort of the first step in being able to get back on that trajectory of putting new patients on the drug.
>
> ***
>
> *I don't think that those singular cases change the benefit risk profile for the drug in any way. That's really what we have been communicating to physicians. I think over time, they have taken that on board and we started to see that in their perception of the drug.*

142. Williams's statement that physicians had "digested the information, taken it on board and their perspective about the safety profile of the drug has kind of gotten back to where it was before the PML event" was false and misleading because Defendants failed to disclose that sales of Tecfidera across the United States had not recovered to the level prior to the PML death. *See* ¶¶56-67, 69-75. Kingsley also admitted after the Class Period that Defendants knew the PML death had led to a significant change to the safety profile and physicians' view of Tecfidera. *See* ¶¶98, 150.

**J. <u>May 19, 2015 UBS Global Health Care Conference</u>**

143. Kingsley made the following false and misleading statements during a May 19, 2015 UBS conference:

**Tony Kingsley - Biogen Inc. - EVP of Global Commercial Operations**

> *[W]e still think [Tecfidera] has the best profile in the market.* It is the best profile, the oral in a market that is moving toward orals.... We like the profile and *we think we can execute to continue growth.*

144. Kingsley's statements that "we think we can execute to continue growth" and "Tecfidera has the best profile in the market" were false and misleading because Tecfidera sales

has declined since late 2014. *See* ¶¶56-67, 69-75. Kingsley also admitted after the Class Period that physician views of Tecfidera's safety profile had not yet recovered. *See* ¶¶98, 150.

### K. May 27, 2015 Sanford C. Bernstein Strategic Decisions Conference

145. Clancy made the following false and misleading statements regarding Tecfidera performance at a May 27, 2015 Sanford Bernstein conference:

> **Paul Clancy - Biogen Inc. - EVP & CFO**
>
> [T]here was a safety event late last year *where physician perceptions on the safety profile declined a little bit*, still in a very good competitive profile vis-a-vis other therapies in the marketplace. *Those have stabilized, right.*
>
> ***
>
> *We continue to see our share of capturing of new scripts and switched scripts higher than our share. That's usually an indication that we'll get upward momentum in the business…. we'd be surprised if we don't see forward momentum from here*.

146. Clancy's statements that physician perceptions of Tecfidera's safety profile had "stabilized" and that "we'll get upward momentum in the business," such that "we'd be surprised if we don't see forward momentum from here" were false and misleading, because he failed to disclose that Tecfidera sales had significantly declined since late 2014. *See* ¶¶56-67, 69-75. Defendants also admitted after the Class Period that physician views of Tecfidera had not yet recovered. *See* ¶¶98, 150.

147. On May 27, 2015, Biogen's stock closed up $10.04 a share, in increase of more than 2.5%.

## VII. THE WHOLE TRUTH IS REVEALED

148. On July 24, 2015, the Company drastically cut *in half* expected growth in 2015, attributing the change to the performance of Tecfidera. In its Form 8-K, the Company stated:

- Revenue growth is expected to be approximately 6% to 8% compared to 2014, a decrease from prior guidance based largely on revised expectations for the growth of [Tecfidera].

149. The Company stated in its July 24, 2015 Form 10-Q that "[d]uring 2015, [Tecfidera]'s U.S. patient growth versus prior quarters has moderated primarily due to changing physician prescribing patterns and intense competition."

150. On the July 24, 2015 earnings call, Defendants disclosed the PML death's actual impact on Tecfidera revenues:

> **George Scangos – Biogen Idec Inc – CEO**
>
> We had expected to see a reacceleration of Tecfidera this quarter, but that did not happen to any appreciable extent.
>
> ***
>
> **Tony Kingsley - Biogen Idec Inc. - EVP of Global Commercial Operations**
>
> We believe the safety event reported in late 2014 has created greater caution on the part of both physicians and patients about switching to orals. Our US market research indicates a moderation in physician intent to prescribe, though in Q2, Tecfidera continued to gain patients in the US.
>
> ***
>
> **Paul Clancy - Biogen Idec Inc. - CFO**
>
> Let me turn to our updated full year 2015 guidance. We now expect revenue growth between 6% and 8%. This substantial decrease from our prior guidance is primarily driven by a change in our estimate for Tecfidera's trajectory. Our balance of year forecast assumes limited patient growth for Tecfidera in the United States.

151. The market reacted negatively. Appearing on CNBC prior to the market opening on July 24, 2015, Jim Cramer stated that Biogen's announcement was "a horrendous guide

down" from the previous "guidance for their MS drug Tecfidera" and that Biogen's disclosure was "shattering" and "gaffes to the people who have loved this stock."[6]

152. Analysts on the earnings call questioned management's abrupt about-face on Tecfidera. Kingsley admitted in response to an analyst's question that the October 22, 2014 announcement was a "significant change statement for the profile of Tecfidera, given its very pristine safety profile at the time."

153. Speaking on behalf of the Company, Doug Williams conceded that Biogen saw "a modest but not trivial increase in discontinuations in Tec[fidera] in the United States."

154. In response to the July 24, 2015 disclosures, Biogen's stock price plummeted *over 20%* in a single day on unusually heavy trading volume, with 16,611,700 shares traded compared with an average daily trading volume over the Class Period of 1,807,174 shares. The share price dropped $85.02, from $385.05 to $300.03, with a corresponding market cap loss of approximately $20 billion.

155. A July 24, 2015 PiperJaffray analyst reported that it was "a lackluster 2Q as slowing MS franchise performance including Tecfidera (which is supposed to be the strongest growth driver for this growth company) led to a big revenue miss and downward revision to guidance…. The miss on revenue and lowered 2015 guidance is problematic for a growth company…."

156. A July 24, 2015 J.P. Morgan report stated that Biogen's "2Q report is a messy one to say the least, with a top-line miss…, a pretty significant guidance cut…. Sales for Tecfidera were the key driver of the rev[enue] miss." The report further stated that:

---

6 The Mad Dash, *Cramer's Mad Dash: Biogen's biotech blues*, CNBC LLC (July 2, 2015, 9:24a.m. ET), http://video.cnbc.com/gallery/?video=3000400303

> For Tecfidera, what was thought to be a one-time blip in 1Q now clearly appears to be much more systemic; we are lowering our 2020 Tec estimate by ~$2B or 30%. Mgmt pointed to… greater caution in prescribing driven by the PML case/label update (leading to a moderation in doctor intent to prescribe). The co[mpany] also noted that discontinuation rates in the US are higher than expected….

157. A July 27, 2015 J.P. Morgan report questioned management's credibility: "management credibility is clearly tarnished, and there's little doubt that the company is now stuck in the penalty box…. The messy 1Q report was supposed to be a one-time anomaly. Instead, 2Q results and revised guidance seem to indicate the problem is much more systemic. It's no wonder that investor confidence is shaken."

158. A July 27, 2015 Morgan Stanley report stated that "[Management] has a credibility issue with its seeming inability to stem the now sig[nificant] decline in base business performance."

## VIII. ADDITIONAL SCIENTER ALLEGATIONS

### A. Tecfidera Was Biogen's Leading Source of Revenue

159. Tecfidera revenues were Biogen's main revenue source throughout the Class Period, accounting for more than $2.5 billion or one-third of total revenue:

| | Tecfidera Revenue | Total Revenue | Tecfidera Revenue as % of Total Revenue |
|---|---|---|---|
| Q4 2014[a] | $916,000,000 | $2,640,675,000 | 34.69% |
| Q1 2015[b] | $824,900,000 | $2,554,963,000 | 32.29% |
| Q2 2015[c] | $883,300,000 | $2,591,642,000 | 34.08% |
| Total | **$2,624,200,000** | **$7,787,280,000** | 33.7% |

[a] Source: January 29, 2015 Form 8-K
[b] Source: April 24, 2015 Form 10-Q
[c] Source: July 24, 2015 Form 10-Q

160. In its October 22, 2014 From 10-Q for 2Q 2014, Biogen emphasized the importance of Tecfidera:

> Our current revenues depend upon continued sales of our principal products, AVONEX, TECFIDERA, TYSABRI, and RITUXAN. We may be substantially dependent on sales from our principal products for many years, including an increasing reliance on sales of [Tecfidera] as we expand into additional markets.

161. During the January 12, 2015 JPMorgan Healthcare Conference, Scangos stated that Tecfidera was a major business driver for the Company:

> The products that we launched recently will continue to be major drivers and will play an increasingly large part in our pipeline obviously as we go forward. We believe that [Tecfidera] will continue to be a major business driver as it continues to expand in markets where it's already been introduced, and as we introduce it into additional markets around the world.

162. During the Company's January 29, 2015 earnings call, Clancy emphasized that the Company's revenue guidance was chiefly dependent on Tecfidera: "Our plan assumes [Tecfidera] will represent the largest contributor to our overall revenue growth."

163. The Company's February 4, 2015 Form 10-K for the fiscal year ending December 31, 2014 stated that:

> Product sales for AVONEX, TECFIDERA and TYSABRI and unconsolidated joint business revenues for RITUXAN each accounted for more than 10% of our total revenue for the years ended December 31, 2014 and 2013….
>
> ***
>
> Our current revenues depend upon continued sales of our principal products, TECFIDERA, AVONEX, TYSABRI, and RITUXAN. *We may be substantially dependent on sales from our principal products for many years, including an increasing reliance on sales and growth of [Tecfidera] as we continue to expand into additional markets.*

164. During the March 2, 2015 Cowen Healthcare Conference, Scangos referred to Tecfidera as "certainly our main driver" while discussing the Company's growing market share in MS treatment.

165. The Company's April 24, 2015 Form 10-Q for 1Q 2015 stated:

> Our current revenues depend upon continued sales of our principal products. We may be substantially dependent on sales from our principal products for

many years, including an increasing reliance on sales of [Tecfidera] as we expand into additional markets.

**B. The Individual Defendants' Awareness of Tecfidera Sales and Physician Perceptions of Tecfidera Safety**

166. Defendants conducted market research during the Class Period that confirmed a "moderation" in physician intent to prescribe Tecfidera that was disclosed on July 24, 2015. Defendants misleadingly stated during the Class Period that internal market research "suggests that physician intent to prescribe may be improving."

167. Defendants had access to prescription and sales information for Tecfidera that was entered into the Company's systems on a daily basis that demonstrated the drop in Tecfidera sales immediately after the PML death was announced.

**C. The Individual Defendants' Compensation**

168. Scangos and Clancy also profited from meeting bonus targets based on revenue growth, which in turn depended mainly on Tecfidera growth.

169. The Company's April 30, 2015 proxy states that the following "Company Goals" were part of the Company's 2014 Annual Bonus Plan: Earnings Per Share (25% weight); Revenue (25% weight); Expand MS Franchise (20% weight).

170. Scangos and Clancy's compensation for 2014 is set forth below:

| Name and Principal Position | Salary | Bonus | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|---|
| George Scangos, CEO and President | $1,375,000 | $4,047,313 | $12,120,939 | $1,088,117 | $18,631,369 |
| Paul Clancy, CFO | $698,389 | $811,632 | $2,824,497 | $355,499 | $4,690,017 |

**D. Share Buyback**

171. Biogen's Board of Directors voted to authorize a $5 billion share repurchase program in May 2015, two months before the full disclosure of the truth regarding Tecfidera's performance following the PML incident.

172. As of June 30, 2015, Biogen had already repurchased approximately 100,000 shares at a cost of $42,200,000 to the Company. By September 30, 2015, Biogen had purchased 9.7 million shares at a cost of nearly $3 billion to the Company.

**E. As Head of Commercial Operations, Kingsley Oversaw Biogen's Salesforce**

173. As Executive Vice President for Commercial Operations, Kingsley was responsible for overseeing Biogen's sales force and commercial operations. When the Company announced his departure, Scangos stated that Kingsley had been responsible for the launch and introduction of Tecfidera into the market.

174. During the January 29, 2015 earnings call, Kingsley discussed the Company's sales force "talking to a broad set of physicians." On a February 25, 2015 call with RBC Capital Markets, Kingsley discussed the perception of Tecfidera when asked "what's the feedback from the salesforce" about the impact of the PML death.

175. As a result of his close proximity to Biogen's sales force, Kingsley was aware of, or was reckless in not being aware of, the immediate and significant impact the PML death had on sales of Tecfidera and physician prescribing patterns.

## IX. CLASS ACTION ALLEGATIONS

176. Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3), on behalf of a Class consisting of all purchasers of Biogen's publicly traded securities, including common stock and exchange-traded options on such common stock, during the period from December 2, 2014 through July 23, 2015, inclusive (the

"Class Period"), and who were damaged thereby. Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer or director of Biogen during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) Biogen's employee retirement and benefit plan(s); (vi) and the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

177. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Biogen had more than 234 million shares of common stock outstanding that traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Biogen or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

178. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

179. GBR Group will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

180. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made (or omissions) by Defendants to the investing public during the Class Period misrepresented (or omitted) to state material facts about Biogen's business, in particular the revenue growth and sales prospects for Tecfidera, which was a core component of its business, as well as the Company's operations and management;

(c) whether the Defendants made their misstatements or misrepresentations with the required scienter; and

(d) to what extent the members of the Class have sustained damages and the proper measure of damages.

181. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## X. APPLICABILITY OF PRESUMPTION OF RELIANCE UNDER THE AFFILIATED UTE DOCTRINE, AND/OR, IN THE ALTERNATIVE, THE FRAUD ON THE MARKET DOCTRINE

182. Plaintiff is entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah* v. *United States*, 406 U.S. 128 (1972), because the claims asserted herein against the Defendants are primarily predicated upon omissions of material fact which there was a duty to disclose.

183. Plaintiff is entitled to a presumption of reliance because, as more fully alleged above, the Defendants failed to disclose material information regarding Tecfidera during the Class Period.

184. Alternatively, Plaintiff is entitled to a presumption of reliance under the fraud on the market doctrine of the Defendants' material misrepresentations and omissions, because at all relevant times, the market for Biogen's securities was an efficient market for the following reasons, among others:

(a) Biogen's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) As a regulated issuer, Biogen filed periodic public reports with the SEC (and was eligible to file SEC Form S-1) and the NASDAQ;

(c) Biogen regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) Biogen was followed by numerous investor research services that published publicly available reports, as well as by several securities analysts (including Eric Schmidt, Cristina Ghenoiu, and Anthony B. Rizzuto, Jr. at Cowen and Company; Geoffrey Porges at Sanford C. Bernstein & Co., Inc.; Ian Somaiya and Matthew Luchini at Nomura Asset Management; Chris Raymond at Robert W. Baird & Company, Inc.; Bret

Holley, Darren Gacicia, William Tanner, and Matthew Lillis at Guggenheim Securities, LLC; Matthew Harrison, Matthew S. Pommer, and Amy Le at Morgan Stanley; Michael J. Yee, Adnan Butt, John Chung, and Jeffrey Takimoto at RBC Capital Markets; Brian Abrahams, Matthew J. Andrews, Shin Kang, and Ronald Hsu at Wells Fargo Securities, LLC; Robyn Karnauskas, Mohit Bansal, Evan Seigerman, Alethia Young, and Arjun Mehra at Deutsche Bank; Cory Kasimov, Whitney G. Ijem, Brittany Terner, and Morgan T. Haller at JPMorgan; Ravi Mehrotra, Vamil Divan, Fumiyoshi Sakai, Ronak H. Shah, Koon Ching, Anuj Shah, Jason Kantor, Ari Jahja, and Jeremiah Shepard at Credit Suisse; Joshua E. Schimmer, Jerry Yang, and Steven P. Breazzano at PiperJaffray; John Sonnier, Matt Phipps, and Andy T. Hsieh at William Blair; Geoffrey Meacham, Michael Ulz, Carter Gould and Jack Meehan at Barclays Capital; Ying Huang at Bank of America Merrill Lynch; Matthew Roden, Jeffrey Hung, Charles Shi, Bradley Canino, and Andrew Peters at UBS Securities; Mark Schoenebaum at Evercore ISI; Terence Flynn at Goldman Sachs; and Jim Birchenough, Chuck Whitesell, Nick Abbott, and Yanan Zhu at BMO Capital Markets; Karen Andersen, Damien Conover, and Julie Stralow at Morningstar; Thomas Wei, Rebecca Forest, Shaunak Deepak, and Timothy Chou at Jefferies; Jeffrey Loo at S&P Capital IQ; Bart Classen at Summer Street Research Partners; Joseph P. Schwartz, Paul Matteis, and Mayank Mamtani at Leerink; Jason N. Butler and Harry Jenq at JMP Securities; Akiva Felt at Oppenheimer & Co.; Yaron Werber at Citigroup;

Stephen Willey at Stifel Nicolaus & Co.; David Nierengarten at Wedbush Securities; Joe Pantginis at Roth Capital Partners; Mara Goldstein at Cantor Fitzgerald) at major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

185. As a result of the foregoing, the market for Biogen's securities promptly digested current information regarding Biogen from all publicly available sources and reflected such information in Biogen's stock price. Under these circumstances, all purchasers of Biogen's securities during the Class Period suffered similar injury through their purchase of Biogen's securities at artificially inflated prices and a presumption of reliance applies.

## XI. NO SAFE HARBOR

186. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements or omissions pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Further, most of the identified false and misleading statements and omissions herein are not forward looking statements, but are statements of current and historic fact regarding Biogen's practices.

187. To the extent that any of the false and misleading statements identified herein are mixed statements of current fact and forward looking projection, the portion of those statements relating to current fact are not protected by the safe harbor. This includes, but is not necessarily

limited to, the statements contained in ¶¶106, 108, 111, 113, 115, 117, 128, 131, 135, 139, 141, and 145.

188. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Biogen who knew that those statements were false when made.

## XII. LOSS CAUSATION/ECONOMIC LOSS

189. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the damages suffered by Plaintiff and the Class.

190. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct which artificially inflated the price of Biogen's securities by misrepresenting, or failing to disclose that (1) Tecfidera sales dropped steeply and deeply immediately after the Company disclosed the first PML death; (2) Tecfidera sales never recovered during the Class Period; and (3) that physician confidence in Tecfidera's safety profile eroded significantly after the first PML death and also never recovered during the Class Period.

191. The truth about Tecfidera's performance was partially disclosed during an earnings call on April 24, 2015, in which Defendants acknowledged some moderation in the *growth* of Tecfidera. In response, Biogen's stock price dropped more than 6%.

192. The truth about Tecfidera's performance during the Class Period was fully and finally disclosed in a press release before the market opened on July 24, 2015, and during an earnings call during the morning of July 24, 2015, in which Defendants announced (1) lower than expected revenues due to poor sales and physician perceptions of Tecfidera, which led to (2)

reduced guidance. In response, Biogen's stock price plummeted more than 20% in a single day on unusually heavy trading volume, with 16,611,700 shares traded compared with an average daily trading volume over the Class Period of 1,807,174 shares.

## COUNT I

### Violation Of Section 10(b) Of The Exchange Act And Rule 10b-5(b) Promulgated Thereunder Against All Defendants

193. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

194. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public regarding Biogen's business, operations, management and the intrinsic value of Biogen's securities; and (ii) cause Plaintiff and other members of the Class to purchase securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

195. Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Biogen's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.

196. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a

continuous course of conduct to conceal adverse material information about Biogen's key MS drug Tecfidera, as specified herein.

197. The Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Biogen's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Biogen's business, specifically its MS product Tecfidera, in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Biogen's securities during the Class Period.

198. Each of the Individual Defendants' primary liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these Defendants, by virtue of his responsibilities and activities as a senior officer of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports, particularly with respect to Tecfidera, Defendants' most important source of revenue during the Class Period; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these Defendants was aware of the Company's

dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading, or failed to disclose material information that made those statements false and misleading.

199. The Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing the true condition of Biogen's business, specifically the significant problems Tecfidera faced following the announcement of the PML incident, from the investing public and supporting the artificially inflated price of the Company's securities. As demonstrated by Defendants' misstatements throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

200. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Biogen's securities was artificially inflated during the Class Period. In ignorance of the fact that market price of Biogen's securities was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Biogen's securities during the Class Period at artificially high prices and were damaged when the value of

their securities declined upon disclosure of the truth about Defendants' false and misleading statements and omissions.

201. At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding Biogen's business, specifically the significant problems Tecfidera experienced in the marketplace after the first PML death, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Biogen's securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

202. By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

203. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## COUNT II

**Violation Of Section 10(b) Of**
**The Exchange Act And Rule 10b-5(a) and (c)**
**Promulgated Thereunder Against All Defendants**

204. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

205. This Count is brought solely and exclusively under the provisions of Rule 10b-5(a) and (c). Accordingly, Plaintiff need not allege in this Count nor prove in this case that any of the Defendants made any misrepresentations or omissions of material fact for which they may also be liable under Rule 10b-5(b) and/or any other provisions of law.

206. During the Class Period, Defendants carried out a common plan, scheme, and unlawful course of conduct that was intended to, and did: (i) deceive the investing public, including Plaintiff and the Class; (ii) artificially inflate the market price of Biogen's securities; and (iii) cause Plaintiff to purchase Biogen's securities at artificially inflated prices.

207. In furtherance of this unlawful plan, scheme and course of conduct, Defendants employed devices, schemes and artifices to defraud, and knowingly and/or recklessly engaged in acts, transactions, practices, and courses of business that operated as a fraud and deceit upon Plaintiff and the Class in connection with their purchases of Biogen's securities, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder.

208. Defendants' fraudulent devices, schemes, artifices and deceptive acts, practices, and course of business included the knowing and/or reckless suppression and concealment of information regarding Biogen's business, specifically the significant problems Tecfidera experienced in the marketplace after the first PML death.

209. Plaintiff and the Class reasonably relied upon the integrity of the market in which Biogen's securities traded.

210. During the Class Period, Plaintiff and the Class were unaware of Defendants' fraudulent scheme and unlawful course of conduct. Had Plaintiff and the Class known of Defendants' unlawful scheme and unlawful course of conduct, they would not have purchased Biogen's securities, or if they had, would not have done so at the artificially inflated prices paid for such securities.

211. As a direct and proximate result of Defendants' scheme to defraud and such unlawful course of conduct, Plaintiff and the Class suffered damages in connection with their purchases of Biogen's securities during the Class Period.

212. By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder, and are liable to Plaintiff and the Class for damages suffered in connection with their purchases of Biogen's securities during the Class Period.

**COUNT III**

**Violation Of Section 20(a) Of**
**The Exchange Act Against the Individual Defendants**

213. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

214. The Individual Defendants acted as controlling persons of Biogen's within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's core operations and/or intimate knowledge of the false statements filed by the Company with the SEC and otherwise disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements regarding Biogen's business, specifically the significant problems Tecfidera experienced in the marketplace after the first PML death, prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

215. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have

had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

216. As set forth above, Biogen's violated Section 10(b) and Rule 10b-5 by its acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act as control persons of Biogen, the primary violator. As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a) Determining that this action is a proper class action and certifying GBR Group as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Labaton Sucharow LLP and Bronstein, Gewirtz & Grossman, LLC as Lead Counsel, and Thornton Law Firm LLP as Liaison Counsel;

(b) Awarding compensatory out of pocket damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: January 19, 2016

**LABATON SUCHAROW LLP**

By: *__/s/ Jonathan Gardner________________*
Jonathan Gardner (admitted *pro hac vice*)
Angelina Nguyen (admitted *pro hac vice*)
Guillaume Buell (BBO #676566)
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email: jgardner@labaton.com
anguyen@labaton.com
gbuell@labaton.com

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**
Peretz Bronstein (admitted *pro hac vice*)
Yitzchak Soloveichik (admitted *pro hac vice*)
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
Email: peretz@bgandg.com
soloveichik@bgandg.com

*Attorneys for Lead Plaintiff GBR Group, Ltd. and Co- Lead Counsel for the Class*

**THORNTON LAW FIRM LLP**
Michael P. Thornton (BBO #497390)
Garrett J. Bradley (BBO #629240)
Andrea M. Landry (BBO #663932)
100 Summer Street, 30th Floor
Boston, Massachusetts 02110
Telephone: (617) 720-1333
Facsimile: (617) 720-2445
Email: mthornton@tenlaw.com
gbradley@tenlaw.com
alandry@tenlaw.com

*Liaison Counsel for the Class*

## CERTIFICATE OF SERVICE

I, Jonathan Gardner, certify that on this 19th day of January, 2016, I electronically filed this Amended Class Action Complaint with the Clerk of the U.S. District Court using the CM/ECF system which will be sent electronically to all counsel of record.

*/s/ Jonathan Gardner*
Jonathan Gardner